QUINN v. TULLY.

1. CONTRACTS—PROFIT SHARING AGREEMENT—ACCOUNTING — EVIDENCE—MINES.
  Held, upon a consideration of conflicting testimony, that an oral agreement as claimed by complainant in his bill for accounting, to procure options on and develop adjoining mining properties and to share profits and expenses, was established by the evidence.

2. SAME—STATUTE OF FRAUDS—ACCOUNTING.

   Where complainant and defendant orally agreed to secure op-
   tions on adjoining parcels of land containing mineral, to
   divide profits and expenses, and to interest capital in the de-
   velopment, and defendant procured an option on one of the
   parcels in his own name, cleared up the title, and obtained
   stock in a corporation which was organized to develop the
   mineral rights, defendant claiming that the particular piece
   of land was not included in the agreement, a bill for an ac-
   counting was the proper remedy, and was not open to the
   objection that it would enforce specifically an oral contract
   relating to real property.

3. SAME—LACHES.

   Mere lapse of time, not accompanied by a change of defend-
   ant's position to his disadvantage, would not bar complain-
   ant's remedy, and a delay of six or more years, during which
   complainant supposed his interest in the property was recog-
   nized by defendant, and litigation over the title was in pro-
   cess, was insufficient to constitute laches as to complainant,
   who filed his bill within a year after discovering the true sit-
   uation.

Appeal from Marquette; Cooper, J. Submitted Janu-
ary 4, 1912. (Docket No. 163.) Decided March 20, 1913.
Rehearing denied June 2, 1913.

Bill by John H. Quinn against William J. Tully and
others for an accounting. From a decree for defendants,
complainant appeals. Reversed.

*William P. Belden*, for complainant.

*M. S. McDonough, F. D. Mead,* and *Charles H.
Watson*, for defendants.

McALVAY, J. The bill of complaint in this case was
filed by complainant against defendant William J. Tully
for an accounting between them for one-half of the profits
arising to said defendant, realized by him from an option
and mining lease on valuable mineral land located in Iron
county, claimed by complainant to have been obtained for
their joint benefit. The other defendants are: Margaret

Tully, the wife of the principal defendant; the Tully Mining Company, which was organized to take over this option and mining lease; and the Crystal Falls Iron Mining Company, which had taken an agreement, or sublease, from the Tully Mining Company. This dispute affects only the one-half, being 200 shares, of the capital stock of the Tully Mining Company which was taken by said Tully at the time said corporation was organized (of which he gave one share to his wife), and one-half of the profits arising therefrom. An injunction was prayed for against defendant Tully to restrain him from selling or transferring said stock in the Tully Mining Company, or his interest in the royalties under the sublease, to the defendant the Crystal Falls Iron Mining Company, one-half of which complainant prays may be decreed to be accounted for and one-half of said stock transferred to him. All of the defendants, except the Crystal Falls Iron Mining Company, have filed separate answers, specifically denying that complainant ever had any interest or claim in the option and lease of the property in question, and each of the defendants claims the benefit of the statute of limitations.

As to the defendant the Crystal Falls Iron Mining Company, a stipulation in the case was entered into providing that it might continue during the pendency of this litigation under the terms of its lease with the Tully Mining Company, and under its agreement with defendant Tully and other stockholders to pay royalties, and that such defendant might be relieved from filing an answer or other pleading, and the case might be deemed at issue without entering its default, providing that such payment of royalties should not prejudice any right of complainant to demand an accounting from defendant William J. Tully and Margaret Tully of such proportion of royalties as the court might decree complainant entitled to recover, and that such sums so paid should be included in any accounting ordered by the court. Issues were duly joined upon the answers of the defendants. The judge of the court

being disqualified, the cause was heard before a judge
from an adjoining circuit, called in for that purpose.
After such hearing, a decree was entered by said court,
denying complainant any relief, and dismissing his bill of
complaint. Complainant has appealed from this decree
to this court.

No statement which will give an understanding of the
dispute in this case can be made which will not be of con-
siderable length, as is evidenced by the attempts on the
part of both parties in their briefs.

In stating the following facts, out of which this litiga-
tion arises, a better understanding will be had if they are
stated in the order in which they occurred, and in every
instance where a dispute occurs it is stated clearly and
distinctly.

Complainant had lived at Ishpeming many years, and
was acquainted with the officers of the large iron mines
operating there, and at the time was actively interested in
securing options on mineral lands in several counties.
He was selling lubricating oils as his principal business.
Defendant Tully had once worked in iron mines at
Ishpeming and was acquainted with the officials of the
mining companies operating on the Menominee Range.

Defendant Tully, on July 2, 1902, when he first met
complainant, was conducting a store at Iron River, where
he had lived for many years. On this date complainant
was on a train going from Ishpeming to Iron River with
two mining men to look at what was known as the Peter-
son property, in which he afterwards acquired an interest.
Defendant Tully was on the same train and joined com-
plainant and the others in a conversation which they were
having relative to iron ore property, and mentioned what
he called the "Baker property," which he considered
promising and a good place for exploration. Arriving at
Iron River, complainant and defendant Tully walked to-
gether from the train uptown. In the evening, by invita-
tion of Tully, complainant went to his store, where Tully

urged him to go and see the Baker property, which he considered the best in the district, and encouraged him to join him in exploring it, saying he was not able to undertake it alone. Complainant did not go at this time, but promised that when next he came to Iron River he would visit the property with him. Between the 1st and 15th of August following, he came again to Iron River, where he met Tully, who called his attention to his promise, and they agreed to go together to the Baker property on the next day. Tully prior to this time had not engaged in the work of exploring or developing mining property. He had held an option on this Baker property, which lapsed because he was unable to dispose of it. On their way to see this property they walked past the Caspian mine, which was in the valley below on the section next south, which cornered upon it. They went up the valley of a small stream which flows down from the Baker property. They walked across the Baker property, examining a shallow pit, which complainant thought indicated a formation the same as at the Caspian mine. They both supposed that the ore formation followed this valley up from the Caspian mine. The view from the Baker property down the valley confirmed this opinion.

The Baker and Houlihan properties were located side by side in the corner of adjoining townships. The Baker land, which they examined that day, is described as the S. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$, and W. $\frac{1}{2}$ of the S. E. $\frac{1}{4}$, section 31, township 43 N., range 34 W. The Houlihan land, now known as the Tully mine, lies directly west of the Baker land, and is described as the S. $\frac{1}{2}$ of the S. E. $\frac{1}{4}$, section 36, township 43 N., range 35 W. The valley, down which the parties were looking when they were on the Baker land, extends from where they stood, in a southwesterly direction, and crosses the southeast corner of the 40 acres of the Houlihan land next adjoining the Baker property on the west. Tully encouraged complainant to join him while they were there on the Baker land, and again told complainant he was not financially able to ex-

plore it alone. Complainant expressed a favorable opinion
of the situation and designated a desirable place to begin
drilling, and claims that he said, as this was near the
western line, the chances were that the big body of ore
might be on the adjoining property to the west. Tully
disputes this, claiming that complainant thought the ore
lay on the east part of this Baker 40. Complainant tes-
tified that he said he would not care to join with him or
spend money on the Baker property unless they could get
the other; that Tully said to him the adjoining property
on the west was known as the Houlihan property, owned
by people in Escanaba, and mentioned the names of
Fogarty and Dineen, and said he could secure an option
or lease at any time at the same royalty asked by Baker
on his property. All of this statement relative to the
Houlihan lands is disputed by Tully.

These parties on this day called at the Baker house,
and Tully introduced complainant as a mining man from
Ishpeming, and said that they wanted to get an option
again. Baker replied that they could have an option
whenever they wanted it. In returning from the Baker
property they walked across the middle of the Houlihan
property. Complainant testified that they discussed on
the way proposed methods of handling these options; that
Tully proposed offering them for sale at a lump sum, but
complainant advised that they should show confidence in
the property by retaining an interest and offering leases
at an excess royalty, which they would divide between
them (the record shows that they afterwards adopted this
plan); that Tully approved of this plan, and a definite
verbal agreement was then made by which they were to
share equally the expenses of securing and disposing of
the options and the profits derived from doing so. Com-
plainant agreed to put into the venture $1,000 to $2,000.
He testified that he told Tully, who knew the fee owners
of both properties, to get 90 days' time on the Baker op-
tion before they were obliged to begin exploratory work,
and in the meantime he would undertake to bring some

one to begin the work; that when they had the Baker work under way, so as not to have two things on at the same time, they would take up the Houlihan property; that this plan was assented to by Tully.

It is proper to state here that the entire dispute in this case is relative to the Houlihan property. Defendant Tully denies that the verbal contract made at that time covered the option to be obtained on that property. In all other respects as to the terms and conditions of the agreement entered into his testimony substantially agrees with that of complainant. There is no controversy in this case over the Baker option or the circumstances and conditions under which it was secured.

After this verbal contract was entered into, complainant sent Capt. Platto, local superintendent of the Ishpeming Mining Company, to look at the Baker property. He was in the employ of M. A. Hanna & Co., who had an option on the Peterson property in that vicinity. The Baker option was secured September 3, 1902, running to both parties. This option Tully showed Capt. Platto when he visited the property. He went over this Baker property with Tully at his request and examined it carefully for the purpose of reporting to his company. Complainant continued to be active in interesting parties in the option already secured and then wrote Judge Flannigan, then attorney for the Oliver Iron Mining Company, for that purpose. Judge Flannigan directed him to write to Dr. N. P. Hulst, vice president of the Oliver Iron Mining Company, which he did. Defendant was also active in securing exploratory work to be done and wrote the president of the Oliver Iron Mining Company and other parties on the same subject. These negotiations resulted in this company taking an option on the Baker property at a royalty of 14 cents per ton, being an advance of four cents.

Exploratory work was begun by it on this property November 17, 1902, as appears by a letter written by Tully to complainant. Soon after this, complainant (as he claims in pursuance of their agreement), wrote Tully and

asked him if he had closed the option on the Houlihan property, as these operations would arouse interest in adjoining lands and he was anxious to hurry securing that option. He received no reply to this letter, and Tully denies having received it, and testified that he preserved but a very small part of their correspondence and threw the rest in the waste basket.

January 18, 1903, Tully wrote complainant that the Oliver Company had reached the ledge, and on February 14th following, that they had struck ore on the Baker property. Complainant testified that he then wrote Tully again saying they ought to close the Houlihan matter or some one else would get the benefit of their work. He received no reply to this letter. Tully also denies having received it.

In June, 1903, complainant visited these properties. He found that the Verona Mining Company had its drills on the Houlihan property, but had suspended work. Tully told him that they had struck ore on the property. He also told him that he had taken an option on this property and turned it over to the Verona Mining Company, and complainant supposed that he was included in the option. Tully also told complainant that the Verona Mining Company had suspended work because the title was defective.

On January 10, 1903, Tully, without the knowledge of complainant, had obtained an option on the Houlihan property from Fogarty and others, in his own name, and on February 21, 1903, had transferred this option to the Verona Mining Company. No exploratory work was done on the Houlihan property after this company suspended operations in the summer of 1903 until July, 1905.

In June, 1903, the Oliver Company also discontinued work on the Baker property, and threw up the option. To avoid forfeiting this option these parties hired men and continued the exploratory work for about 30 days; each paying one-half of all expenses. They then endeavored for several months to find some one to take the Baker op-

tion, and in the fall of 1903 the Penn Mining Company began exploratory work, which continued until June, 1905.

On December 9, 1904, complainant and Tully took a mining lease from Baker, and at the same time he agreed to waive the payment of the minimum royalty for six months, provided they would continue their exploratory work. In June, 1905, as stated, the Penn Company quit work, and surrendered their option, and complainant and Tully were obliged to pay the minimum royalty and otherwise to comply with the terms of the lease until the property was taken by the controlling owners of defendant the Crystal Falls Iron Mining Company, at an advance royalty of six cents per ton, and agreements were entered into assuring each one-half of this advance, which they have continued to receive until the present time.

In August, 1903, soon after the work had been abandoned on the Houlihan property on account of the defective title, Tully went to the Penn Company about taking the Baker option. He saw Judge Flannigan, then a practicing attorney acting for the Penn Company, and also Mr. Kelly, its representative, and told him about the defective title to the Houlihan property, on account of which the Verona Mining Company threw up the option. Tully represented this as a good property if the title were cleared up. Judge Flannigan said they would not undertake to do anything with the property until the title was cleared. Tully then entered into an arrangement with Judge Flannigan to clear this title, and in consideration for his services agreed that he would give him a one-half interest in the option, and he further agreed that when the title was perfected the Penn Company, if it desired, should have the option. Judge Flannigan then told Kelly to take the Baker option, saying that he could have the Houlihan after the title was cleared up. The Penn Company took the Baker option, but abandoned it long before the Houlihan title was perfected.

During these negotiations Tully made no mention of any interest of complainant in this option. About this

time, in 1903, Tully claims he told complainant of this arrangement he had made with Judge Flannigan in case he succeeded in clearing the title. Complainant testifies that this was told him by Tully in 1905. While the work of perfecting the title was in progress, Tully kept complainant informed about the difficulty they were having and upon everything that was done about both properties. Complainant always approved the work done in clearing up this title. There is no contention on his part but that under the circumstances the arrangement made with Judge Flannigan was the best possible. He has never questioned the advisability of making it. The title was a complicated one and required a great deal of skill and a long time in which to perfect it. The parties in interest lived in various parts of the United States and in Canada, and during the negotiations some of the heirs in interest died, and various other complications arose. Finally, after more than three years, Judge Flannigan succeeded in obtaining a lease of this Houlihan property, signed by all the parties in interest. He paid practically all of the expenses incurred by him, including traveling expenses. Tully claims to have paid a small part of these expenses, but could not say how much he had paid.

Pending the litigation of *Houlihan* v. *Fogarty*, 162 Mich. 492 (127 N. W. 793), Judge Flannigan, as attorney for the Tully Mining Company, secured a stipulation assuring to that company the validity of its lease of the Houlihan property whatever the final outcome of the case might be. Tully did not know of this stipulation until from three to six months after it was made. Complainant first learned of this arrangement in July or August, 1909.

This court determined in *Houlihan* v. *Fogarty*, *supra*, that the parties who gave the first option to Tully (except Mrs. Houlihan, the widow) had no interest in the premises.

In September, 1905, Judge Flannigan organized the Tully Mining Company, and the lease which was obtained from the fee owners ran to it as lessee. Its capital stock

was divided into 400 shares, of which 200 were issued to Judge Flannigan for his services and expenses, and 199 to Tully, and one share to his wife (given for the purpose of perfecting the organization). Then the Tully Mining Company made a sublease to the defendant the Crystal Falls Iron Mining Company, which had for some time been operating the Baker mine, at an advance royalty of six cents on all ore mined, with a provision that the Tully Mining Company should receive an increased minimum royalty. Complainant claims that he did not learn these facts until a long time afterwards, and defendant Tully agrees with him that he disclosed the extent of his interest in this property in August, 1909. The bill of complaint was filed in the instant case January 18, 1910.

In order to determine the one question of fact presented, it has been necessary to carefully analyze and digest all the testimony in the case, for the reason that it all bears on this question and must all be considered in its determination. It can be of no benefit to the profession to here give a digest and our analysis of the testimony of the several witnesses, but it will be sufficient for the purposes of this opinion to give results only. Our conclusion, from such analysis of the testimony in the case, is that complainant has established by a fair preponderance of the evidence his claim that this agreement made between him and defendant Tully included the Houlihan property. The testimony of witnesses on his part, relative to statements made by Tully to that effect, has not been met or overcome by the testimony of defendant Tully and his witnesses. They are not impeached, and, as far as the record shows, are business men of standing and character in the communities in which they live. The circumstances specifically detailed by them as to the causes which brought them to these properties and their interviews with defendant Tully are not denied by him, but in effect are admitted.

It will be necessary next to consider whether complainant is entitled to enforce this contract. Having deter-

mined from the evidence in the case that the contract claimed by complainant to have been made was entered into between these parties, it must be treated as an entire contract, covering both properties, in which each had an equal share. The complainant, on his part, has performed fully all he undertook to perform, and, if anything remains to be determined, it will be his half of whatever expenses Tully has paid in and about the Houlihan property, which may be found upon an accounting to be had in this case.

Complainant in this case is not seeking to enforce the specific performance of a verbal contract relative to an interest in land. This case involves an accounting by defendant Tully, who, as complainant claims, wrongfully disposed of an interest arising out of the Houlihan option, belonging jointly to himself and complainant, and to compel him to account for all profits and proceeds; also for a transfer to complainant of one-half of the shares of stock issued to him by the Tully Mining Company, and such relief against said company as may be necessary in the premises. In our opinion complainant is entitled to such relief. *Ripley* v. *Seligman*, 88 Mich. 177 (50 N. W. 143).

The remaining question to be determined is whether complainant has been guilty of laches. It is our opinion, under the facts and circumstances of this case, that it cannot be claimed that complainant has been guilty of laches, and, to a certain extent, we have already, in discussing the question of his delay in asserting his rights to the Houlihan property, foreshadowed such a conclusion. The title to the Houlihan property was questioned to the extent that the explorers abandoned their work six months after the option was acquired by Tully, and later was in litigation for several years. There has been in this case no change of position on the part of defendant Tully, nor does it appear that he relied upon the silence or conduct of complainant and thereby changed his position to his disadvantage, by reason of which it would be inequitable that the complainant should now assert his rights. Mere

lapse of time, without such change, cannot in itself constitute laches. This conclusion is supported by the authorities. Mr. Pomeroy, in his Equity Jurisprudence, says:

" The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. He must in fact act upon it in such a manner as to change his position for the worse; in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it." 2 Pomeroy's Equity Jurisprudence, § 805.

See, also, *Ripley* v. *Seligman, supra.*

The decree of the circuit court is reversed, and a decree will be entered in this court in favor of complainant, determining the rights of these parties in accordance with this opinion, and the cause will be remanded for an accounting between the parties as prayed in the bill of complaint, with costs of both courts to complainant.

STEERE, C. J., and MOORE, BROOKE, STONE, and OS-TRANDER, JJ., concurred. BIRD, J., did not sit.